# EXHIBIT B



LEXSEE 2007 U.S. DIST. LEXIS 71287

**STANDARD INVESTMENT CHARTERED, INC., Plaintiff -against- NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., et al., Defendants.**

**07 Cv. 2014 (SWK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*621 F. Supp. 2d 55; 2007 U.S. Dist. LEXIS 71287*

**September 26, 2007, Decided**
**September 26, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Std. Inv. Chtd., Inc. v. NASD, 2008 U.S. Dist. LEXIS 4617 (S.D.N.Y., Jan. 23, 2008)*

**PRIOR HISTORY:** *Std. Inv. Chtd., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 2007 U.S. Dist. LEXIS 51055 (S.D.N.Y., July 13, 2007)*

**COUNSEL:** [**1] For Standard Investment Chartered, Inc., On behalf of itself and all others similarly situated, Plaintiff: Jonathan Watson Cuneo, LEAD ATTORNEY, Michael Lenett, William H. Anderson, Cuneo Gilbert & Laduca, LLP, Washington, DC; Richard David Greenfield, LEAD ATTORNEY, Greenfield & Goodman LLC, Easton, MD.

For National Association of Securities Dealers, Inc., also known as NADSD, Mary L. Schapiro, Richard F. Brueckner, Barbara Z. Sweeney, Defendant: Douglas Randall Cox, LEAD ATTORNEY, Gibson, Dunn and Crutcher (DC), Washington, DC.

For NYSE Group, Inc., Defendant: Douglas W. Henkin, Manuel Yanez, LEAD ATTORNEYS, Milbank, Tweed, Hadley & McCloy LLP, New York, NY; David S. Cohen, Milbank Tweed Hadley & McCloy LLP, Washington, DC.

**JUDGES:** SHIRLEY WOHL KRAM, U.S.D.J.

**OPINION BY:** SHIRLEY WOHL KRAM

**OPINION**

[*60] **SHIRLEY WOHL KRAM, U.S.D.J.**

Defendants National Association of Securities Dealers, Inc. ("NASD") [1] and NYSE Group, Inc. ("NYSE"), on behalf of themselves and several individual defendants, seek a protective order preventing plaintiff Standard Investment Chartered, Inc. ("Standard") from disclosing documents that Standard has acquired during expedited discovery. For the reasons that follow, the Court desires additional briefing [**2] on the motion.

> 1   After the close of negotiations, NASD changed its name to the Financial Industry Regulatory Authority, Inc. ("FINRA"). For the sake of convenience, the Court continues to refer to defendants FINRA, Mary L. Schapiro, Richard E. Brueckner, and Barbara Z. Sweeney as the "NASD Defendants," or, for brevity's sake, "NASD."

**I. BACKGROUND**

The procedural posture of this case is somewhat complex. The relevant facts are as follows: On March 8, 2007, Standard, a member of the NASD, filed a class action complaint challenging the then-pending regulatory consolidation of the NASD and the NYSE (the "Consolidation"). Standard alleged that the Consolidation would disenfranchise certain NASD members, and that the defendants failed to comply with Delaware state law while soliciting support for the Consolidation. Against the defendants' wishes, Standard was granted limited expedited discovery in aid of an anticipated motion to preliminarily

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

enjoin the Consolidation. *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers* ("*Standard I*"), 07 Cv. 2014 (SWK), 2007 WL 1121734 (S.D.N.Y. Apr. 11, 2007). Shortly thereafter, however, the Court dismissed Standard's complaint for failure to [**3] exhaust administrative remedies before the Securities and Exchange Commission ("SEC"). *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers* ("*Standard II*"), 07 Cv. 2014 (SWK), 2007 WL 1296712 (S.D.N.Y. May 2, 2007).

After the dismissal, the Court directed that "[a]ny party seeking continued protection of documents (or any references to the content of such documents) filed, or sought to be filed, as part of this litigation shall move for a protective order . . . ." *See* 07 Cv. 2014 (SWK), Dkt. No. 83 (the "May 16 Order"). Defendant NASD made a timely motion for such an order. Standard then [*61] filed a motion for reconsideration of the Court's Opinion dismissing its claims. The Court denied Standard's motion for reconsideration on July 13. *See Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealer s* ("*Standard III*"), 07 Cv. 2014 (SWK), 2007 WL 2049730 (S.D.N.Y. July 13, 2007). [2] The parties now seek the resolution of NASD's protective order motion. [3]

> 2    Standard has appealed this decision to the Court of Appeals for the Second Circuit.
> 3    On July 25, 2007, the Court approved the parties' stipulation to submit additional filings in order to accommodate the defendants' introduction [**4] of the Declaration of Todd Diganci in support of NASD's protective order motion. Although Standard labels its filing of July 23, 2007 as an Opposition, *see* 07 Cv. 2014 (SWK), Dkt. No. 115, the Court refers to that filing as a Surreply in this Opinion. Likewise, NASD's filing of August 6, 2007, which is styled a "Second Reply," *see* 07 Cv. 2014 (SWK), Dkt. No. 119, is referred to herein as the Response to the Surreply.

## II. DISCUSSION

A. *Rule 26(c)'s* "Good Cause" Requirement and the Common Law Presumption of a Public Access

The defendants seek a protective order pursuant to *Federal Rule of Civil Procedure 26(c),* which provides that, "[u]pon motion by a party or by the person from whom discovery is sought, . . . and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Although the Court has already dismissed Standard's claims, the Court retains jurisdiction to "dispose of material in its files as it thinks appropriate." *Gambale v. Deutsche Bank AG, 377 F.3d 133, 139 (2d Cir. 2004);*

*see also id. at 141* ("The court's supervisory power does not disappear because [**5] jurisdiction over the relevant controversy has been lost.").

Courts do not generally grant protective orders without a strong showing of "good cause." *Wyatt v. Kaplan, 686 F.2d 276, 283 (5th Cir. 1982).* The burden of establishing good cause lies with the party seeking the protective order. 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2035 (1970) ("Wright & Miller"); *Gambale, 377 F.3d at 142* (quoting *In re "Agent Orange" Prod. Liab. Litig., 821 F.2d 139, 145 (2d Cir. 1987)).*

*Rule 26(c)'s* "good cause" analysis is informed by the common law presumption of public access. The Second Circuit has explained this principle as follows:

> The presumption of access is based on the need for federal courts, although independent--indeed, particularly because they are independent--to have a measure of accountability and for the public to have confidence in the administration of justice. . . . Although courts have a number of internal checks, . . . professional and public monitoring is an essential feature of democratic control. . . . Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)* [**6] ("*Amodeo II*").

There is a strong presumption of public access to "judicial documents," or "items filed with the court that are relevant to the performance of the judicial function and useful in the judicial process." *See In re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006)* (quoting *SEC v. TheStreet.com, 273 F.3d 222, 231 (2d Cir. 2001)* (internal quotation marks omitted)). "Accordingly, a party seeking a protective order sealing trial, other court hearings, or motions and accompanying [*62] exhibits filed with the court must satisfy a more demanding standard of good cause." *In re Terrorist Attacks, 454 F. Supp. 2d at 222-23.*

Nevertheless, the Second Circuit has also noted that "an abundance of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III judicial power. . . . Unlimited access to every item turned up in the course of litigation would be unthinkable." *Id.* The Second Circuit has indicated, therefore, that courts deciding protective order motions must locate documents on "a continuum from

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 4 of 22

Page 3

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

matters that directly affect an adjudication to matters that come within a court's purview solely [**7] to insure their irrelevance." *Id. at 1049*:

> Where testimony or documents play only a negligible role in the performance of Article III duties, the weight of the presumption is low and amounts to little more than a prediction of public access absent a countervailing reason. Documents that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the presumption's reach, and stand on a different footing than a motion filed by a party seeking an action by the court, or, indeed, than any other document which is presented to the court to invoke its powers or affect its decisions.

*Id. at 1050* (internal quotation marks, citations, and alterations omitted).

Recently, the Second Circuit has enumerated the steps that a district court must take when deciding whether to issue a protective order. *See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir. 2006).* First, a court must determine whether "the documents are indeed 'judicial documents.'" *Id. at 119.* If the documents are not judicial, then there is no presumption of public access, and the movant need only make a baseline showing of good cause in order to [**8] justify the imposition of a protective order. If, on the other hand, the court determines that the documents are judicial in nature, it must next determine the weight of the presumption of access by reference to the "continuum" described in *Amodeo II. See id.* (quoting *Amodeo II, 71 F.3d at 1049*). "Finally, after determining the weight of the presumption of access, the court must 'balance competing considerations against it.'" *Id.* (quoting *Amodeo II, 71 F.3d at 1050*).

**B. Application of the *Lugosch* Framework to the Documents at Issue**

**1. Classification of the Documents at Issue as Judicial or "Non-judicial"**

Much of the dispute in the instant case involves whether a presumption of public access should attach to the documents obtained by Standard during its limited expedited discovery. More specifically, the parties disagree as to whether those documents are judicial in nature. There are two categories of documents at issue in this case: (1) those that NASD provided to Standard dur-

ing discovery but that Standard did not file with the Court ("the unfiled documents"), and (2) those that Standard filed (or, with respect to some documents, moved to file) in support of its opposition to NASD's [**9] motion to dismiss and its own motion for reconsideration ("the filed documents"). Standard claims that the filed documents are by nature judicial because they were submitted to the Court with various motions. (*See* Standard's Opp'n 5-6; Standard's Surreply 9-10.) With regard to the unfiled documents, Standard argues that NASD members "have a right to know the content [*63] of these documents, and given the public nature of NASD's self-regulatory obligations to its own members and to the public at large, it stands to reason that the public has a great and substantial interest [in disclosure] as well." (Standard's Opp'n 17.) In contrast, NASD contends that (1) there is evidence that Standard intends to publicize the documents for purposes other than the present litigation (*see* NASD's Mot. 5); (2) Standard only obtained the documents because it claimed that expedited discovery was necessary to aid in the preparation of a preliminary injunction motion--a motion that was never filed (*see* NASD's Mot. 6-7); (3) the unfiled documents are not judicial because they were never submitted to the Court (*see* NASD's Reply 5-6); and (4) the filed documents are not judicial because they are irrelevant to the [**10] Court's adjudication of both NASD's motion to dismiss and Standard's motion for reconsideration (*see* NASD's Mot. 8-10).

Of NASD's numerous arguments, only the last two are relevant at the first step of the *Lugosch* analysis. The Second Circuit has held that the motive of the party seeking access to, or disclosure of, documents is irrelevant to the question of whether and how strong a public right of access exists with respect to those documents. *See Lugosch, 435 F.3d at 123.* Additionally, although Standard's long-promised preliminary injunction motion--the impetus for the grant of expedited discovery--is now an impossibility, NASD cites no authority in support of its argument that this change in circumstances requires the return of all discovery documents. Although "[c]ourts are endowed with broad discretion to tailor protective orders to the circumstances of a particular litigation," *In re Zyprexa Injunction, 474 F. Supp. 2d 385, 414 (E.D.N.Y. 2007),* in light of the key role that public access plays in enabling the public to monitor the Judiciary, the Court declines to rely on the impossibility of Standard's motion for a preliminary injunction in determining whether a public right of [**11] access exists.

**i. The Unfiled Documents**

The Court agrees with NASD that the unfiled documents do not qualify as judicial. The *Amodeo II* Court stated unequivocally that "[d]ocuments that play no role in the performance of Article III functions, such as those

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 5 of 22

Page 4

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

passed between the parties in discovery, lie beyond the presumption's reach . . . ." *71 F.3d at 1050.* Standard acknowledges that many of the discovery documents were never filed but argues that the documents should nonetheless qualify as judicial based on the public's "great and substantial interest" in "NASD's self-regulatory obligations," which "warrants imposing the same burden on NASD to justify keeping such documents confidential as *Rule 26* contemplates." (Standard's Opp'n 17.) At the first *Lugosch* step, however, the Court is only focused on what role the documents played in the underlying litigation. Because the unfiled documents did not in any way figure into the Court's performance of its Article III functions, the documents do not qualify as judicial and carry no presumption of public access. [4]

> 4 Standard also cites *Joy v. North, 692 F.2d 880 (2d Cir. 1982),* for the proposition that the sealing of documents pertaining [**12] to a corporate entity's obligations to its members is "'wholly unjustifiable." (*See* Standard's Opp'n 1 (quoting *Joy, 692 F.2d at 894*).) The documents at issue in *Joy,* however, had already been submitted to the court with a motion for summary judgment. *See Joy, 692 F.2d at 894* ("We believe that foreclosing public scrutiny of *the grounds for this adjudication* is wholly unjustifiable.") (emphasis added). Therefore, although the *Joy* opinion predates the Second Circuit's formal use of the term "judicial documents," *see United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995)* ("*Amodeo I*"), it is entirely consistent with *Lugosch* 's three-step test. *See Joy, 692 F.2d at 893* ("We do not say that every piece of evidence . . . must invariably be subject to public scrutiny. . . . The importance of the material to the adjudication, the damage disclosure might cause, and the public interest in such materials should be taken into account before a seal is imposed.").

[*64] **ii. The Filed Documents**

The documents filed with Standard's opposition to NASD's motion to dismiss and its motion for reconsideration present a harder question. Standard cites broad language in *Lugosch* and subsequent cases, which have [**13] held that, for a document to be judicial, "'[i]t is sufficient that the document was submitted to the Court for purposes of seeking or opposing an adjudication.'" (*See* Standard's Surreply 9 (quoting *United States v. Sattar, 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006)*).) NASD argues, in contrast, that the documents are not judicial because they are "necessarily irrelevant" to the Court's dismissal of the litigation and denial of reconsideration. (NASD's Resp. to Surreply 4; NASD's Reply 7 ("Here,

the documents at issue are legally irrelevant to the question before the Court, and therefore inadmissible.").)

The *Lugosch* Court stated that "'relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies.'" *435 F.3d at 122* (quoting *FTC v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 409 (1st Cir. 1987)*). In elucidating this standard, the Second Circuit provided several guideposts to facilitate the identification of these documents. First, the ultimate disposition of an underlying motion is inapposite to whether the documents submitted in conjunction with that [**14] motion qualify as judicial. *See Lugosch, 435 F.3d at 121; see also id. at 122* ("'[I]f . . . there would have been a right of public access had the motion been granted, we fail to see why such a right did not attach merely because the motion was denied.'") (quoting *Republic of the Phillipines v. Westinghouse Elec. Corp., 949 F.2d 653, 660 (3d Cir. 1991)*). Additionally, at the first step in the *Lugosch* analysis, the court should assume that the parties "have supported their papers with admissible evidence and non-frivolous arguments." *Lugosch, 435 F.3d at 122.*

Third, the Second Circuit also stressed that documents should not "receive different weights of presumption based on the extent to which they were relied upon in resolving the motion," *Lugosch, 435 F.3d at 123:*

> If the rationale behind access is to allow the public an opportunity to assess the correctness of the judge's decision documents that the judge *should* have considered or relied upon, but did not, are just as deserving of disclosure as those that actually entered into the judge's decision. Moreover, once those submissions come to the attention of the district judge, they can fairly be assumed to play a role in the court's [**15] deliberations.

*Id.* (internal quotation marks, citations, and alterations omitted) (emphasis in original); *see also Prescient Acquisition Grp., Inc. v. MJ Publ'g Trust, 487 F. Supp. 2d 374, 375-76 (S.D.N.Y. 2007)* (categorizing as judicial documents those that "could be relied upon by either party or the court" in deciding the motion or on appeal); *Sattar, 471 F. Supp. 2d at 386* ("After *Lugosch,* it appears that the test focuses not on whether the document was actually used by the [*65] court but, rather, on the role the document was intended to play in the exercise of the court's Article III duties."). With these guideposts in mind, the Court now evaluates the extent to which the

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 6 of 22

Page 5

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

filed documents are judicial documents subject to the presumption of public access.

### a. Documents Filed in Connection with NASD's Motion to Dismiss

*Lugosch* definitively reinforced *Amodeo II*'s ruling that documents submitted in connection with a motion for summary judgment are judicial documents for presumption-of-access purposes, *435 F.3d at 123*, a principle that district courts have faithfully applied. *See, e.g., Prescient, 487 F. Supp. 2d at 374; Allen, 420 F. Supp. 2d 295, 302*. Other courts in this Circuit have found [**16] the presumption applicable in other contexts, as well. *See, e.g., In re San Francisco Chronicle, 07-00256-MISC (TCP), 2007 U.S. Dist. LEXIS 68322, 2007 WL 2713859, at *3 (E.D.N.Y. Sept. 14, 2007)* (noting that presumption applies to "search warrant materials after an investigation is over") (citing *In re Newsday, Inc., 895 F.2d 74, 76 (2d Cir. 1990)); Sattar, 471 F. Supp. 2d at 386* (holding that letter and report filed in conjunction with defendant's sentencing submission are judicial because they supported her argument at sentencing). It appears, however, that the post-*Lugosch* status of documents filed in connection with a motion to dismiss is an issue of first impression in this Circuit. The Court must therefore apply the *Lugosch* framework to this novel situation.

As an intitial matter, the Court concludes that the dismissal of an action is an "adjudication" for presumption-of-access purposes. *See Joy v. North, 692 F.2d 880, 893 (2d Cir. 1982)* (defining "adjudication" as "a formal act of government"). NASD's motion to dismiss contains four main grounds: lack of subject matter jurisdiction, ripeness, absolute immunity, and failure to state a claim upon which relief can be granted. Lack of subject matter jurisdiction [**17] and ripeness are governed by *Federal Rule of Civil Procedure 12(b)(1). See Fed. R. Civ. P. 12(b)(1); Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005)* ("Ripeness is a jurisdictional inquiry."). Absolute immunity and the defense of failure to state a claim upon which relief can be granted are governed by *Rule 12(b)(6). See Fed. R. Civ. P. 12(b)(6); Scher v. Nat'l Ass'n of Sec. Dealers, Inc., 386 F. Supp. 2d 402, 404 (S.D.N.Y. 2005)* (analyzing absolute immunity defense using *Rule 12(b)(6)), aff'd 218 Fed. Appx. 46 (2d Cir. 2007)*. "Motions to dismiss under *12(b)(6)* . . . are distinct, procedurally and substantively, from motions to dismiss under *12(b)(1)*." *Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990)*. This distinction is relevant to the public's ability to monitor the courts' Article III function, so the Court will analyze each type of motion in turn.

A *Rule 12(b)(1)* jurisdictional challenge can be facial or factual. *Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 887 n.15 (2d Cir. 1996)* (citing *Ohio Nat'l, 922 F.2d at 325*). A facial challenge attacks "the sufficiency of the jurisdictional facts alleged," *Poodry, 85 F.3d at 887 n.15*, [**18] while a factual challenge challenges the facts themselves. *Id.* A court resolving a facial challenge must accept the factual allegations of the complaint as true, *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992)* (internal citations omitted), but should refrain from drawing inferences favorable to the party asserting jurisdiction, *United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester [*66] County, New York, 495 F. Supp. 2d 375, 378 (S.D.N.Y. 2007)*. However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)* (internal quotation marks, citations, and alterations omitted). In discharging this obligation, "[a] district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *Id.* (internal quotation marks and citation omitted).

Applying the principles of *Amodeo II* and *Lugosch* to this situation, the Court concludes that documents submitted in connection with a *Rule 12(b)(1)* motion [**19] to dismiss that includes a factual challenge to subject matter jurisdiction qualify as judicial documents because a court could legitimately rely upon them when deciding the motion. Consequently, the public would have an interest in accessing the documents in order to assess the court's decision.

Unlike *Rule 12(b)(1)*, however, *Rule 12(b)(6)* requires the court to take all factual allegations of the complaint as true. *See, e.g., Stewart v. Jackson & Nash, 976 F.2d 86, 87 (2d Cir. 1992)* (citing *LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991)); Ford v. Airline Pilots Ass'n Int'l, 268 F. Supp. 2d 271, 276 n.1 (E.D.N.Y. 2003)*. Moreover, the court cannot consider evidence outside the pleadings without giving the parties notice and an opportunity to present additional evidence and converting the motion into one for summary judgment. *See Fed. R. Civ. P. 12(b)*.

In light of the foregoing, the Court concludes that documents submitted in connection with a *Rule 12(b)(6)* motion cannot qualify as judicial. The potentially capacious statements in *Lugosch* and its progeny must be read within the context of the unique evidentiary constraints imposed by *Rule 12(b)(6)*. Documents submitted with such a [**20] motion are, by definition, excluded from the court's purview, and are therefore of no value to someone wishing to evaluate the court's decision. On the other hand, if the court *does* consider the documents (making the documents necessary for meaningful public

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 7 of 22

Page 6

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

monitoring), the motion is no longer a *Rule 12(b)(6)* motion for dismissal but is now a *Rule 56* for summary judgment. [5] Ultimately, because documents submitted with a *Rule 12(b)(6)* motion can play no role in the court's deliberations absent conversion, the documents cannot qualify as judicial for presumption-of-access purposes. [6]

    5   Taking conversion into account does not violate the *Lugosch* Court's admonition that the outcome of a motion is irrelevant to a document's status as judicial. *See Lugosch, 435 F.3d at 121-22*. Conversion pertains not to a motion's ultimate disposition but only to the threshold question of what documents (if any) "the judge *should* have considered or relied upon." *Id. at 123* (emphasis in original).

    Additionally, though the public undoubtedly has an interest in ensuring judicial compliance with the conversion rule, disclosing documents simply so that the public can check to make sure that a court did *not* rely [**21] upon them would be unnecessary. If a judge did consider outside evidence but mistakenly failed to convert the motion to one for summary judgment, this error would likely be evident on the face of the opinion, *see, e.g., Fonte v. Bd. of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988)* (noting that district court's "unexplained reference" to factual matters not contained in complaint suggested that court had considered evidence outside pleadings when adjudicating *Rule 12(b)(6)* motion).

    6   The Fourth Circuit, which has adopted the Second Circuit's standard for defining judicial documents, has reached a similar outcome in at least one case. *See In re Policy Mgmt. Sys. Corp., 94-2254, 94-2341, 1995 U.S. App. LEXIS 25900, 1995 WL 541623, at \*4 (4th Cir. Sep. 13, 1995)* (holding that documents filed with *Rule 12(b)(6)* motion to dismiss are not judicial documents because they "do not play any role in the adjudicative process"). This decision, however, predates *Lugosch* and implies that a court can take an *ex post* perspective by looking at what documents a judge *actually* considered when determining whether they can qualify as judicial. *See id.* The Court therefore does not rely on *In re* [**22] *Policy Management* for its conclusions in the instant case.

[*67] Turning to the case at hand, NASD based its *Rule 12(b)(1)* motion on ripeness and exhaustion grounds. Both are jurisdictional issues and enable a court to look beyond the pleadings. *See, e.g., Russo v. City of Hartford, 184 F. Supp. 2d 169, 180 (D. Conn. 2002)* (stating that motion to dismiss based on failure to exhaust administrative remedies constitutes factual challenge to subject matter jurisdiction warranting examination of evidence beyond pleadings) (citing James W. Moore et al., Moore's Federal Practice P 12.30[4] (3d ed. 2001)); *see also Liberty Cable Co. v. City of New York, 893 F. Supp. 191, 198-99, 199 n.11 (S.D.N.Y. 1995)* (looking to evidence outside pleadings when disposing of motion to dismiss on ripeness grounds). Any documents submitted by Standard in response to NASD's *Rule 12(b)(1)* arguments qualify as judicial documents because the Court had discretion to consider them, and therefore they fall within the realm of evidence that the Court potentially "should have considered." *Lugosch, 435 F.3d at 123* (emphasis removed).

    Standard, however, cited none of the disputed documents in the exhaustion and ripeness sections [**23] of its opposition. The only exhibits submitted in opposition to NASD's *Rule 12(b)(1)* motion are NASD's Proxy Statement, a NASD news release, a New York Superior Court opinion, and a Delaware state court opinion, none of which is confidential. [7] The assessment of the *Rule 12(b)(1)* documents therefore ends here. [8]

    7   Despite Standard's dubious, *ex post* assertion to the contrary, (*see* Standard's Opp'n 5), the Court cannot conclude that Standard submitted the disputed documents in response to NASD's *Rule 12(b)(1)* motion. Given Standard's confidence several months ago that "the existing record is more than adequate to support the Court's exercise of jurisdiction," (Standard's Opp'n to NASD's Mot. to Dismiss 7), one would think that Standard would cite to documents in that record when demonstrating that jurisdiction exists. The Court will not permit Standard to take unfair advantage of the common practice of making multiple *Rule 12* motions in the same document.

    8   In *Prescient Acquisitions Group*, Judge Castel held that a document cannot escape classification as judicial simply because no party cited to it in the briefs accompanying a motion. *487 F. Supp. 2d 374, 375-76 (S.D.N.Y. 2007)*. *Prescient*, [**24] however, is distinguishable from the instant case, because it involved documents submitted in connection with only one motion--a motion for summary judgment--while the instant case actually involves two separate motions with different evidentiary constraints--motions to dismiss under *Rule 12(b)(1)* and *12(b)(6)*. Therefore, in contrast to *Prescient*, the documents submitted could not be "relied upon by either party or the court," and would not be "deemed fair [or] ap-

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 8 of 22

Page 7

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

propriate for either side to rely upon" on appeal. *Id.*

Standard does cite several of the disputed documents in its opposition to NASD's *Rule 12(b)(6)* motion. As previously discussed, however, the Court has concluded that documents submitted in connection with a *Rule 12(b)(6)* motion are not judicial, absent conversion of the motion to summary judgment. In this case, there was no such conversion. [9] Therefore, the documents submitted by Standard in opposition to NASD's *Rule 12(b)(6)* motion do [*68] not qualify as judicial and carry no presumption of public access. In summary, none of the documents submitted in connection with NASD's motion to dismiss carry a presumption of public access as judicial documents.

9   The Court did allow limited [**25] expedited discovery, but only for the purpose of Standard's anticipated preliminary injunction motion, which was never filed.

**b. Documents Filed in Connection with Standard's Motion for Reconsideration**

As with the Rule 12 motions discussed above, the Court could find no case law in the Second Circuit applying the principles of *Amodeo II* and *Lugosch* to documents filed in connection with a motion for reconsideration. Also, like Rule 12 motions to dismiss, motions for reconsideration have unique evidentiary constraints that bear on the Court's *Lugosch* analysis.

In the Southern District of New York, *Local Civil Rule 6.3* governs motions for reconsideration of a court order determining a previous motion. Under this Local Rule, a court may "reevaluate its earlier ruling depending upon 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Equal Employment Opportunity Comm'n v. Local 638 . . . Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 01 Cv. 2877 (RLC), 2001 U.S. Dist. LEXIS 19, 2001 WL 12007, at *1 (S.D.N.Y. Jan. 2, 2001) (quoting *Virgin Atlantic Airways v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)); see* [**26] *also Fisk v. Letterman, 04 Cv. 6972 (VM), 501 F. Supp. 2d 505, 2007 U.S. Dist. LEXIS 60235, at *2-*3 (S.D.N.Y. Aug. 15, 2007)).* Nevertheless, as a general proposition, a motion for reconsideration "is not the proper avenue for the submission of new material." *Sys. Mgmt. Arts Inc. v. Avesta Technologies, Inc., 106 F. Supp. 2d 519, 521 (S.D.N.Y. 2000)* (citing *Local Rule 6.3); see also Treppel v. Biovail Corp., 03 Cv. 3002 (PKL), 2005 U.S. Dist. LEXIS 2737, 2005 WL 427538, at *3 (S.D.N.Y. Feb. 22, 2005)* ("A party seeking reconsideration is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then

use such a motion to advance new theories or adduce new evidence in response to the court's rulings.") (internal quotation marks and citation omitted). In light of these purposes, a party may only submit new evidence in connection with a reconsideration motion with the court's permission. *See Local Rule 6.3.* [10]

10   Standard and NASD dispute *Local Rule 6.3*'s exact meaning. Standard argues that, because the Rule's text bars only the submission of affidavits without court permission and is silent with regard to actual documentary evidence, submission of such evidence is permissible if it is not accompanied [**27] by an affidavit. (*See* Standard's Op-p'n 3 n.2.) The case law interpreting *Local Rule 6.3*, however, indicates that the regulation of affidavits stems from the prohibition on the submission of new evidence. *See, e.g., First Financial Ins. Co. v. Allstate Interior Demolition Corp., 96 Cv. 8243 (RLC), 1998 U.S. Dist. LEXIS 13685, 1998 WL 567900, at *3 (S.D.N.Y. Sept. 3, 1998)* ("*Because the motion does not afford the losing party the right to submit new evidence to bolster relief,* parties are not to submit affidavits in support of a Rule 6.3 motion for reconsideration unless directed by the court.") (internal quotation marks and citation omitted) (emphasis added). Additionally, allowing a party to submit documentary evidence without an accompanying affidavit would allow circumvention of *Federal Rule of Evidence 901*'s authentication requirement. *See Fed. R. Evid. 901(a).* Therefore the Court concludes that a party cannot evade *Local Rule 6.3*'s strictures simply by submitting evidence without an accompanying, authenticating affidavit.

Standard, with the permission of the Court, filed several discovery documents under seal in support of its motion for reconsideration. *See* May 16 Order; *Standard III,* 2007 WL 2049730, at *4 n.2. [**28] Therefore, any documents that Standard submitted in support of its arguments--arguments that, at this step, the Court must assume to be valid and "non-frivolous," *see Lugosch, 435 F.3d at 122*--qualify as judicial [*69] documents for presumption-of-access purposes, because they are documents that the Court "should have considered" while resolving the motion. *See id. at 123* (emphasis removed).

In addition, Standard sought leave to file various discovery documents under seal, including certain NASD documents that, pursuant to a confidentiality agreement, Standard sought to keep hidden from NYSE, despite the fact that those documents might affect NYSE's losing rights (the "NASD-only documents"). *See Standard III,* 2007 WL 2049730, at *4 n.2. NYSE objected to the inclusion of these documents. *Id.* The Court indicated that

it would only grant Standard leave to amend its motion for reconsideration in order to include the documents if a protective order governing their use was entered. *Id.*

Because the parties never proposed a protective order that addressed how the NASD-only documents should be treated, the documents were never filed. As unfiled documents, they do not qualify as judicial and enjoy no [**29] presumption of public access. *See Amodeo II, 71 F.3d at 1050.* [11]

> [11] In its denial of Standard's motion for reconsideration, the Court indicated that, because it had "no reason to believe that the remaining NASD-only documents would be relevant to this motion," it "now formally rejects Standard's request to submit the NASD-only documents in its motion for reconsideration." *Standard III,* 2007 WL 2049730, at *4 n.2. Thus, even if the NASD-only documents did qualify as judicial, the presumption of public access would be nominal.

In sum, the Court concludes that the unfiled documents and the documents submitted in connection with NASD's motion to dismiss do not qualify as judicial documents for presumption-of-access purposes. Therefore, NASD must satisfy the baseline standard of good cause in order to justify their continued protection. [12] The documents accepted by the Court in connection with Standard's motion for reconsideration, on the other hand, are judicial, and therefore the Court proceeds to the second step of the *Lugosch* analysis with respect to those documents.

> [12] *See infra* Part II.B.3.

**2. Weight of the Presumption of Access to the Judicial Documents**

When determining the weight of [**30] the presumption of access that applies to a given set of judicial documents, a court must consider "'the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *Lugosch, 435 F.3d at 119* (quoting *Amodeo II, 71 F.3d at 1049*). Again, the important factor is not whether the court *actually* relied upon the documents when deciding the documents, but whether the documents were "material" to the court's decision. *See In re Zyprexa, 474 F. Supp. 2d at 412* (internal citation omitted). Here, the identification of "material" documents requires specification of the legal arguments that were properly before the Court on Standard's motion for reconsideration. *See Parrish v. Sollecito, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003)* (holding that motion for reconsideration may only be granted if the movant "demonstrate[s] controlling law or factual mat-

ters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision"). [13]

> [13] The Court is mindful of the Second Circuit's admonition in *Lugosch* that scrutiny [**31] of each argument in a brief can often be "extremely difficult and a waste of judicial resources." *Lugosch, 435 F.3d at 123* (internal citation omitted). When determining the weight of the presumption of access for documents submitted with a motion for reconsideration, however, it is essential to identify the arguments that were validly before the court.

[*70] Analysis of this kind does not run afoul of the *Lugosch* Court's statement that the ultimate disposition of a motion is irrelevant to whether documents submitted therewith are judicial. *See Lugosch, 435 F.3d at 121-22.* In *Lugosch,* the district court concluded that it could not ascertain the status of discovery documents filed with a summary judgment motion until after disposition because it would not know until then which of several alternative legal arguments would form the basis for its decision. *See id. at 116.* The Second Circuit rejected this reasoning, holding that documents submitted to support any legal argument legitimately before the court are judicial, regardless of whether the court reaches a particular argument or disposes of the motion on other grounds. *See id. at 122.* There is a difference, however, between an unreached [**32] but nonetheless viable argument and an argument that, by definition, *cannot* properly be presented in the given motion. In other words, the question is not whether an argument is persuasive, but whether the court can even entertain the argument in the first place. Although a court should assume that each validly presented, alternative ground has the potential to be dispositive, *see id.,* no such assumption applies to arguments the court is jurisdictionally barred from considering. Were the Court to conclude otherwise, parties could simply manufacture a presumption of access for otherwise confidential documents by using them to support obviously irrelevant or nonviable arguments. [14]

> [14] Although in practice there is sometimes a point at which the line between meritless but properly presented arguments and irrelevant or otherwise nonviable arguments begins to blur, it is the courts' responsibility to maintain this distinction whenever possible. In the context of a motion for reconsideration, a court simply cannot consider arguments that were not before it on the underlying motion. *See Fisk, 501 F. Supp. 2d 505, 2007 U.S. Dist. LEXIS 60235, at *4.* The public undoubtedly has an interest in evaluating a

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 10 of 22

Page 9

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

court's [**33] conclusion that a particular argument in a motion for reconsideration is nonviable. The documents submitted in support of that argument, however, are not necessary for the assessment, as the court can determine the viability of the argument based on the parties' characterization of it in their (publicly available) briefs.

The Court dismissed Standard's amended complaint on exhaustion grounds. *See Standard II*, 2007 WL 1296712. In response, Standard produced two valid arguments: first, Standard argued that its proxy claims were not within the scope of the SEC's then-pending review, *see Standard III*, 2007 WL 2049730, at *2; next, it argued that its "core damages claim" was exempt from exhaustion, *see id.* at *2-*3. Standard, however, also improperly argued for relief based on new legal theories not presented to the Court in Standard's submissions opposing the underlying motion to dismiss. *See id.* at *3 (rejecting Standard's breach of fiduciary duty claim), *4 (rejecting Standard's "control premium" claim). Though at least one of these new theories was purportedly based on "newly discovered evidence" (*see* Standard's Mot. for Recons. 10), the discovery of new evidence does not permit a party [**34] to advance a claim in its motion for reconsideration that was not before the court originally. *See Fisk, 501 F. Supp. 2d 505, 2007 U.S. Dist. LEXIS 60235, at *4* (noting that courts should construe *Local Rule 6.3* so as to prevent parties from "advanc[ing] different theories not previously argued") (internal citation omitted).

In the instant case, the documents submitted in support of Standard's blatantly invalid arguments (its breach of fiduciary duty and "control premium" claims) enjoy [*71] only a nominal presumption of public access. The Court could not consider these arguments when deciding the motion for reconsideration and, consequently, could not consider the documents submitted to support them.

Standard also submitted documents in support of its valid arguments that its proxy claims were not within the scope of SEC review, (*see* Standard's Mot. for Recons. 4-10), and that its "core damages claim" is exempt from exhaustion (*see* Standard's Mot. for Recons. 17-23). The Court, however, determined that "all of the documents submitted with [Standard's] motion for reconsideration [are] *irrelevant* to its exhaustion analysis," the ground on which it had originally dismissed the case. *Standard III,* 2007 WL 2049730, at *4 n.2 [**35] (emphasis added). The documents therefore enjoy only a minimal presumption of public access. *Cf. Lugosch, 435 F.3d at 122* (noting presumption of access for " *relevant documents*" submitted in conjunction with adjudication) (internal quotation marks and citation omitted) (emphasis added); *see also Allen, 420 F. Supp. 2d at 302* (noting that "it is possible that the presumption of access should not apply where a party appends wholly irrelevant material to its summary judgment papers"). [15]

> 15   The Court's conclusion that the documents were *irrelevant* to the exhaustion issue is distinguishable from Judge Koeltl's conclusion in *Sattar* that particular documents were relevant but not "useful." *See Sattar, 471 F. Supp. 2d at 385.*

Before proceeding to the third step of its analysis (a determination of whether countervailing factors outweigh the presumption of access), the *Lugosch* Court paused to consider whether a qualified *First Amendment* presumption of access applied to the documents in question. The Court now follows the same approach.

In addition to the common law presumption of public access discussed to this point, courts have identified a similar presumption stemming from the *First Amendment*. [**36] *See, e.g., Lugosch, 435 F.3d at 124; Gambale, 377 F.3d at 140 n.4*. In its arguments in opposition to NASD's protective order motion, Standard conflates the two presumptions of access, claiming that NASD must "overcome the commonlaw [sic] right of public access with its *First Amendment* foundation." (*See* Standard's Surreply 4 (citing common law and *First Amendment* precedent in same footnote).) [16] Nevertheless, due to the important constitutional principles at stake, the Court construes Standard's argument as a separate assertion of both the common law and the *First Amendment* presumptions of access with respect to all of the documents. *See, e.g., Gambale, 377 F.3d at 141* (recognizing court's role as "primary representative of the public interest" and its duty to determine whether confidential treatment over "records filed wholesale under seal" is warranted) (internal quotation marks and citations omitted); *see also Lugosch, 435 F.3d at 124* ("Having concluded that the common law presumption of access exists in this context, we may not avoid the question [*72] of whether a *First Amendment* presumption of access also exists.").

> 16   In its Surreply, Standard also asserts that a party seeking a protective [**37] order must submit a detailed affidavit by an affiant with personal knowledge containing line-by-line redactions of the documents at issue and the particular justification for each redaction. (*See* Standard's Surreply 3 (quoting *Prescient, 487 F. Supp. 2d at 375*).) As NASD correctly recognizes, however, this requirement is not applicable in all protective order motions, but rather stems from an order issued by Judge Castel in a particularly onerous case involving "the sealed filing of submissions, nearly two feet in height, on a pending summary judgment motion." *Prescient, 487 F. Supp. 2d at*

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 11 of 22

Page 10

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

375. Therefore NASD is not required by law to comply with this procedure, and the Court in its discretion declines to impose it.

The *First Amendment's* "qualified right of access to judicial documents" is "a necessary corollary of the capacity to attend the relevant proceedings." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004). Once a court has determined that the *First Amendment* presumption applies to a particular set of documents, it can only issue a protective order if the moving party satisfies an even more demanding standard of good cause than that applicable under the common [**38] law presumption of access: When "the more stringent *First Amendment* framework applies, continued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124.

In this case, the Court has already determined that the unfiled documents and the documents submitted in connection with NASD's motion to dismiss are not judicial documents. There is thus no *First Amendment* presumption of access with respect to these documents. *Cf. Hartford Courant*, 380 F.3d at 93 (recognizing that *First Amendment* provides "qualified right of access to *judicial* documents") (emphasis added).

The documents submitted with the Court's permission in support of Standard's motion for reconsideration, in contrast, likely carry a *First Amendment* presumption of public access, albeit a limited one. These documents are judicial, and, as the *Lugosch* Court recently reiterated, "access to written documents filed in connection with pretrial motions is particularly important in the situation where no hearing is held and the court's ruling is based solely on [**39] the motion papers." *Lugosch*, 435 F.3d at 124 (quoting *In re New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) (alterations and ellipsis omitted)). Thus, with respect to these documents, NASD must make a more detailed showing of good cause in order to justify their continued protection.

**3. NASD's Good Cause Showing**

Case law construing *Rule 26(c)* has established several factors informing that Rule's good cause requirement. First, the movant must submit a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements in order to establish good cause." Wright & Miller at § 2035. "'Ordinarily, good cause for a protective order exists when a party shows that disclosure will result in a clearly defined, specific and serious injury.'" *Schiller v. City of New York, 04 Cv. 7922 (KMK) (JCF), 04 Cv. 7921 (KMK) (JCF), 2007 U.S. Dist. LEXIS 4285, 2007 WL 136149, at *5*

(S.D.N.Y. Jan. 19, 2007) (quoting *In re Terrorist Attacks*, 454 F. Supp. 2d at 222 (internal quotation marks, citation, and alterations omitted)). "'Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not satisfy the *Rule 26(c)* test. Moreover, the harm must be significant, not [**40] a mere trifle.'" *Schiller*, 2007 U.S. Dist. LEXIS 4285, 2007 WL 136149, at *5* (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)); *cf. Allen*, 420 F. Supp. 2d at 302 (denying protective order motion based solely on "generalized and unsupported claims of harm that might result from disclosure"); *Melohn v. Schraub, 90 Cv. 4456 (SWK), 1991 U.S. Dist. LEXIS 2705, 1991 WL 33415, at *1* (S.D.N.Y. Mar. 7, 1991) (same).

NASD offers several reasons why a protective order is necessary in this case, including the then-pending negotiations with NYSE; the risk of chilling regulatory and administrative discussions by NASD [*73] officials; the need to protect NASD's confidential business information; the fact that Standard has indicated an intention to make the documents public; and the fact that NASD's original disclosure of the documents was in reliance on "the expectation that an appropriate protective order would [eventually] be entered." (*See generally* NASD's Mot. 3-14.) [17] Although NASD's arguments against disclosure are numerous, they lack sufficient depth for the Court to determine whether disclosure is warranted. For instance, NASD asserts that disclosure of certain documents could "complicate, disrupt, or otherwise harm NASD's [**41] relationships with" the SEC, the Internal Revenue Service ("IRS"), and NASD member firms (*see, e.g.,* NASD's Reply, Declaration of Todd Diganci ("Diganci Decl.") P 16), yet it offers no further explanation of *how* those relationships will be damaged. Similarly, NASD makes the heavy-handed claim that "[u]nrestricted disclosure could have unintended consequences to the nation's securities markets as well" (*see* Diganci Decl. P 16), but offers no facts in support of that contention.

> 17   NASD has explicitly disclaimed invocation of the deliberative process and self-evaluation privileges. (*See* NASD's Reply 12-13.)

Because the party seeking a protective order bears the burden of establishing good cause, the Court would normally conclude that NASD has failed to meet its burden and order disclosure of all documents. *See, e.g., Schiller*, 2007 U.S. Dist. LEXIS 4285, 2007 WL 136149, at *6* (rejecting similar justifications against disclosure as "entirely conclusory" and "formulaic"). In this case, however, a significant portion of the parties' briefings addressed the issue of whether any presumption of access applies to the documents, an issue of first impression that the Court has now decided. Moreover, the

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 12 of 22

Page 11

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

NASD-NYSE Consolidation [**42] became effective during the briefing schedule, requiring the parties to modify their arguments in their subsequent briefs. Therefore the Court desires additional argument on whether good cause exists to maintain the confidentiality of NASD's documents. [18]

18  Although time is of the essence when the public right of access is at stake, *see Lugosch, 435 F.3d at 126-27*, the Court cannot escape the conclusion that a decision on the existing record would be premature.

Currently, NASD has sorted the documents at issue into categories, each accompanied by its own justification, but its justifications for each category are at the same level of generality. With respect to the non-judicial documents, NASD must only make a baseline showing of good cause in order to obtain a protective order. [19] *Cf. In re Terrorist Attacks, 454 F. Supp. 2d at 222-23*. For the judicial documents, NASD must make the more detailed showing required by the *First Amendment. See Lugosch, 435 F.3d at 120*.

19  NASD suggests that it should be subject to a diminished good cause requirement because this case "started and ended 'during the pretrial stages of litigation.'" (NASD's Reply 9 (quoting *In re Terrorist Attacks, 454 F. Supp. 2d at 222*).) [**43] *In re Terrorist Attacks*, however, involved "one of the largest private lawsuits in United States history," and Judge Casey based the use of a more general good cause standard on the ground that a standard any more specific "would impose an enormous burden upon the Court and severely hinder its progress toward resolution of pretrial matters." *In re Terrorist Attacks, 454 F. Supp. 2d at 223*. Moreover, in contrast to the instant case, the *In re Terrorist Attacks* Court had not already decided a motion to dismiss and a motion for reconsideration before deciding whether a protective order was necessary. NASD must therefore satisfy the usual standard of good cause and not a more generalized version.

In order to encourage the presentation of viable, relevant arguments, the Court [*74] preliminarily addresses a few of the claims made in the briefs that the parties have already submitted. First, NASD relies heavily on the risk that disclosure of the documents would threaten its then-pending negotiations with NYSE. This argument is now moot. In its only submission since the end of negotiations, NASD offers passing commentary that, despite the end of the negotiations and the approval of the Consolidation, [**44] "it would still be unfair . . . to allow [NYSE] to pick through NASD's negotiating

position," and that disclosure could weaken FINRA in "future transactions" with other parties. (NASD's Surreply 6.) In order to justify continued protection, NASD must provide supporting facts and law (if any) to supplement these bare assertions.

Additionally, the Court finds NASD's "reasonable reliance" argument to be without merit. First, the Second Circuit has applied the reasonable reliance principle when parties claim reliance on an *already existing* protective order. *See, e.g., Gambale, 377 F.3d at 142 n.7; TheStreet.com, 273 F.3d at 228; Martindell v. Int'l Telephone & Telegraph Corp., 594 F.2d 291, 296 (2d Cir. 1979)*. Here, no protective order existed. Furthermore, although NASD produced documents in the expectation that the parties would enter into a confidentiality agreement as directed, this agreement never occurred. Even assuming that reliance on a mere expectation is possible, [20] the Second Circuit has suggested that parties should not rely on "protective orders that are on their face temporary or limited." *Gambale, 377 F.3d at 142 n.7* (quoting *TheStreet.com, 273 F.3d at 230-31*). At least [**45] one district court has thus concluded that "there can also be no reasonable reliance upon an expectation that such an order would be entered in the future." *Schiller, 2007 U.S. Dist. LEXIS 4285, 2007 WL 136149, at *5 n.3*. Here, Standard's proposed confidentiality agreement provided a mechanism to challenge confidentiality designations, (*see* Standard's Opp'n, Declaration of Richard D. Greenfield ("Greenfield Decl.") P 4 (describing Standard's proposed agreement)), and even NASD's proposed protective order contains a similar provision (*see* NASD's Mot. 12) ("Any such order should, of course, . . . provide a mechanism to allow the other parties to challenge any designations that they believe to be inappropriate.")). Because there can be no reasonable reliance on such an order, *see Lugosch, 435 F.3d at 126*, there can be no reasonable reliance on an expectation of its creation. *See Schiller, 2007 U.S. Dist. LEXIS 4285, 2007 WL 136149, at *5 n.3*. Therefore, on the record currently before the Court, NASD cannot make a showing of reasonable reliance.

20  At least one court has applied a protective order retroactively to documents produced in expectation of such an order. *See Allen, 420 F. Supp. 2d at 300*.

Finally, Standard may challenge NASD's forthcoming [**46] factual and legal arguments purporting to establish good cause, an opportunity that will also allow it to elaborate on arguments made late in the proceedings. (*See, e.g.*, Standard's Letter Updating Surreply, July 31, 2007, 07 Cv. 2014 (SWK), Dkt. No. 120 ("Standard's July 31 Letter") (arguing that NASD's justifications for

Case 3:10-cv-01399-CFD   Document 11-2   Filed 02/04/11   Page 13 of 22

Page 12

621 F. Supp. 2d 55, *; 2007 U.S. Dist. LEXIS 71287, **

protection are moot, and that NASD waived confidentiality of documents by discussing them publicly)).

## C. NYSE's Additional Requests

### 1. Maintenance of Certain NYSE Documents Under Seal

Included in the documents that Standard submitted with its motion for reconsideration is a discovery document obtained from defendant NYSE (the "NYSE Document"). NYSE requests that the [*75] Court maintain this document under seal. As discussed above, the documents submitted by Standard to support its motion for reconsideration enjoy a limited presumption of access under both the common law and the *First Amendment*. *See supra* Part II.B. In its request to maintain the NYSE Document under seal, NYSE made the conclusory assertion that disclosure would harm the then-pending negotiations between NASD and NYSE. (*See* NYSE's Mot. P 11.) In light of the critical threshold issue decided in Part II.B, and [**47] because the NASD-NYSE negotiations have since concluded, the Court requires further briefing as to whether continued protection of the NYSE Document is necessary. In order to justify keeping the document under seal, NYSE must provide information that enables the Court to make "specific, on-the-record findings that sealing is necessary to preserve higher values" and to impose an order that "is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124.

### 2. Access to "NASD-Only" Documents Used by Standard Against NYSE

While Standard's motion for reconsideration and NASD's motion for a protective order were both still pending, NYSE asserted in its response to NASD's protective order motion that "if Standard *does* seek to use [NASD-only d]ocuments against NYSE, NYSE has a right to respond to whatever arguments Standard might make based on those documents. To do so, common sense and basic fairness require that NYSE know what the arguments are and on what they are based." (NYSE's Resp. 2.) NYSE stated that, alternatively, the Court could "preclude Standard from using any [NASD-only d]ocuments against NYSE or reaffirm dismissal of the claims against NYSE that Standard purports to base on [**48] such . . . documents." (NYSE's Resp. 3.)

As stated above, the Court formally rejected Standard's request to file the NASD-only documents when it denied Standard's motion for reconsideration. *See Standard III*, 2007 WL 2049730, at *4 n.2. NYSE has stated that, to the extent that Standard does not seek to use the NASD-only documents against NYSE, "NYSE has no need to see those documents in connection with this liti-

gation." (NYSE Resp. 2.) Therefore, in light of the Court's rejection of NASD's proposed filing and denial of reconsideration, NYSE's request is moot. Should this litigation continue [21] and Standard ever renew its request to file NASD-only documents in a proceeding that affects NYSE's legal rights, NYSE may once again submit this argument for the Court's consideration.

    21  *See supra* note 2.

### D. Standard's Request for Mandatory Disclosure to the SEC

Standard asks that the Court, regardless of how it disposes of NASD's protective order motion, order disclosure of the documents to the SEC. (*See* Standard's Surreply 11.) The Court previously addressed this issue when denying Standard's motion for reconsideration, observing that "Standard has already brought the existence of allegedly [**49] relevant documents to the SEC's attention, and the SEC has the authority to solicit any material that it considers necessary to its review." *Standard III*, 2007 WL 2049730, at *3 (citing *15 U.S.C. § 78u*). In fact, Standard "acknowledges . . . that it has asked the SEC to review the expedited discovery materials that have been obtained through this litigation," *id.* at *3, but that the SEC has declined to do so. (*See* Standard's July 31 Letter 1.) Additionally, as the Court has noted several times, Standard [**76] retains the ability to appeal the SEC's approval of the NASD-NYSE Bylaws to the Court of Appeals. *See Standard III*, 2007 WL 2049730, at *3. This Court will not act as Standard's vehicle for foisting the documents upon the SEC. Therefore Standard's request for mandatory disclosure is denied.

## III. CONCLUSION

In light of the importance of the Court's holding on judicial documents and the conclusion of negotiations between NASD and NYSE, the Court requests that the parties make additional submissions regarding whether NASD and NYSE can establish good cause for continued protection of the documents, using the good cause standard elucidated in this Opinion. Instructions for these submissions [**50] will be contained in a separate order accompanying this Opinion.

SO ORDERED.

SHIRLEY WOHL KRAM

UNITED STATES DISTRICT JUDGE

Dated: New York, New York

September 26, 2007



LEXSEE 2007 U.S. DIST. LEXIS 27808

**MEL THOMPSON, Plaintiff, v. AMERICAN BAR ASSOCIATION ET AL., Defendants.**

**Civil Action No. 3:05 CV 1493 (CFD)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2007 U.S. Dist. LEXIS 27808*

**March 30, 2007, Decided**

**COUNSEL:** [*1] Mel Thompson, Plaintiff, Pro se, Derby, CT.

For State of CT, Connecticut Bar Examining Committee, Connecticut Statewide Grievance Committee, Defendants: Maura Murphy-Osborne, LEAD ATTORNEY, Attorney General's Office, Hartford, CT.

**JUDGES:** Christopher F. Droney, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Christopher F. Droney

**OPINION**

**RULING ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Mel Thompson brought this action against the State of Connecticut, the Connecticut Bar Examining Committee ("CBEC"), and the Connecticut Statewide Grievance Committee ("SWGC") on the ground that these defendants have prevented him from taking the Connecticut Bar Examination ("exam") in violation of the U.S. Constitution. [1] Although he has not yet applied to take the exam, Thompson claims that the rules governing qualifications to take the exam prevent him from doing so because he graduated from an internet correspondence law school. This prohibition, he claims, violates his equal protection and due process rights under the *Fifth* and *Fourteenth Amendments to the U.S. Constitution*. He also claims that the Connecticut statute prohibiting the unauthorized practice [*2] of law, *Conn. Gen. Stat. § 51-88*, is unconstitutionally vague. Thompson seeks declaratory and injunctive relief for his claims.

The defendants moved to dismiss the complaint under *Federal Rule of Civil Procedure 12(b)(1)* and *12(b)(6)*. Thompson moved twice for summary judgment pursuant to *Rule 56(a)*. For the following reasons the defendants' motion to dismiss is granted and Thompson's motions for summary judgment are denied as moot.

> 1   Thompson also initially named the American Bar Association, the Law School Admission Council, Inc., Massachusetts School of Law at Andover, Inc., Quinnipiac University School of Law, Southern New England School of Law, University of Connecticut School of Law, and Yale University School of Law as defendants, but he later voluntarily dismissed them from the suit.

**I. Background** [2]

> 2   The following information is taken from the parties' pleadings, briefs on the motion to dismiss, and applicable statutes. It is undisputed unless otherwise indicated.

[*3] This case primarily concerns a challenge to the Connecticut Bar Examining Committee's policies concerning eligibility for taking the Connecticut Bar Examination.

Mel Thompson received a bachelor's degree in Political Science from Southern Connecticut State University ("SCSU") in 1988, and he obtained a master's degree, also in political science, from SCSU in 1997. Thompson enrolled in Massachusetts School of Law ("MSL") in 1998 but soon withdrew for financial reasons. In 2002 he enrolled in William Howard Taft University, an internet correspondence law school based in California. Thompson subsequently transferred to West

2007 U.S. Dist. LEXIS 27808, *

Coast School of Law ("West Coast"), a different internet correspondence school, also based in California, in 2003. Thompson graduated with a juris doctor degree from West Coast in 2005. He now seeks permission to sit for the Connecticut bar exam.

Section 2 of the Connecticut Practice Book [3] governs attorney admissions to the Connecticut bar. Sections 2-3 and 2-4 give CBEC the authority to implement rules and regulations governing Connecticut bar admissions. With the exception of applicants who are already admitted to practice law in other jurisdictions, all applicants [*4] for admission must pass the Connecticut bar exam, which is administered by CBEC. Practice Book § 2-8(6). CBEC will not permit an applicant to sit for the exam, however, unless the applicant's legal education satisfies the requirements set forth in Practice Book § 2-8(4): each applicant must have either (1) received a bachelor of laws [4] degree (or equivalent degree) from a law school approved by CBEC, or (2) obtained an advanced legal degree acceptable to CBEC, at a school approved by CBEC, after receiving a bachelor of laws degree (or equivalent degree) at a non-approved law school, but with CBEC approval of the course of study. Practice Book § 2-8(4). This means that an applicant may sit for the bar under two circumstances. An applicant may take the test if he attended a law school approved by CBEC. Alternatively, an applicant may sit for the exam if he obtains special approval of his primary legal education from CBEC, even though his law school was not approved by CBEC, and then he also obtains an advanced legal degree from a school approved by CBEC.

3   The Connecticut Practice Book provides the rules of practice and procedure before the Connecticut Superior Court.

[*5]

4   This is now known as J.D. ("Juris Doctorate").

The difference between law schools that are approved by CBEC and legal education that is acceptable to CBEC is significant. CBEC maintains a list of approved law schools; all schools accredited by the American Bar Association ("ABA") are included on the list. Non-ABA accredited law schools, however, may also be included on the list if the school petitions CBEC for approval pursuant to CBEC's Regulations, Article II-1(B). Currently, CBEC's approved list of law schools includes two non-ABA accredited schools: Southern New England School of Law ("SNESL") and MSL, the law school Thompson initially attended. No other non-ABA accredited law schools are on CBEC's approved list.

Even if an applicant did not attend a law school on the approved list, his legal education may still be acceptable to CBEC. CBEC will review the legal education of applicants from non-CBEC approved schools on a case-

by-case basis. The applicant seeking review must submit an Evaluation Petition to CBEC that CBEC will either accept or reject. As explained above, if an applicant's [*6] initial legal education is acceptable to CBEC, and the applicant also completes post-graduate work acceptable to CBEC at a school approved by CBEC, then the applicant may take the bar exam.

West Coast, the school from which Thompson graduated, is not on CBEC's approved list of schools, because West Coast is not ABA-accredited and it has not sought approval from CBEC in accordance with Article II-1(B) of CBEC's Regulations. Because of this, to be eligible to sit for the Connecticut bar Thompson must first obtain individualized approval of his West Coast education from CBEC through the Evaluation Petition process. Then, after he receives such approval, he must obtain an advanced legal degree from a CBEC-approved school.

Despite Thompson's wish to take the exam after he attended a non-CBEC approved school, however, he never filed an Evaluation Petition. Thompson claims this is because his petition would be futile, in light of the following statement in the section of CBEC's website that explains the Evaluation Petition process:

To qualify for admission you must have received your law degree from a law school which, at the time you received your degree, was approved by the Bar [*7] Examining Committee. If you do not meet this requirement you may be eligible to sit for the Connecticut bar examination if:

. Your credentials leading to the granting of your law degree are approved by the Bar Examining Committee (note: correspondence and internet law school work will NOT be approved) AND

. You obtain a Master of Laws degree (LLM) from a law school approved by the Bar Examining committee. You are strongly advised to obtain approval from the Bar Examining Committee before your pursue an LLM degree.

Connecticut Bar Examining Committee, U.S. Non-approved Legal Education Petition, at http://www.jud.state.ct.us/CBEC/nonapproved.htm (emphasis in original) (last visited March 29, 2007). Thompson claims that because of this statement, any petition he makes to CBEC for approval of his West Coast education would be automatically rejected, because the state-

ment expresses CBEC's policy of automatically rejecting petitions from internet law school graduates. Thompson now alleges that this policy, which renders him ineligible to sit for the Connecticut bar exam, violates his *Fourteenth Amendment* right to equal protection and his *Fifth and Fourteenth Amendment* due process [*8] rights.

In addition to challenging CBEC's policy, Thompson also claims that *Conn. Gen. Stat. § 51-88*, which prohibits the unauthorized practice of law, is unconstitutionally vague. Thompson compares himself, as an internet law school graduate, with law student interns. Thompson alleges that if he, an internet law school graduate, were to practice law in Connecticut he would be subject to prosecution under *Conn. Gen. Stat. § 51-88*, but law student interns frequently practice law and are not subject to such prosecution. Thompson claims that is an uneven application of the statute, and so it is unconstitutionally vague. Thompson replicates this allegation against SWGC [5] on the basis that SWGC would investigate a claim of the unauthorized practice of law by an internet law school graduate, but SWGC would not conduct a similar investigation into a law student intern.

> 5   SWGC is a committee of fourteen lawyers and seven non-lawyers appointed by the judges of the Connecticut Superior Court "to review, investigate and adjudicate attorney ethics matters . . . to assist the Superior Court in maintaining the integrity of the bar of the State of Connecticut." Statewide Grievance Committee, Statewide Bar Council, (at http://www.jud.state.ct.us/SGC/default.htm (last visited March 26, 2007). SWGC enforces *Conn. Gen. Stat. § 51-88*.

### [*9] II. Legal Standard

A motion to dismiss for lack of subject matter jurisdiction is governed by *Federal Rule of Civil Procedure 12(b)(1)*. Under that rule, a case is properly dismissed "when the court lacks the statutory or constitutional power to adjudicate the case." *Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996)*.

A district court evaluating a motion to dismiss for lack of subject matter jurisdiction under *Rule 12(b)(1)* "must look to the way the complaint is drawn to see if it claims a right to recover under the laws of the United States." *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055 (2d Cir. 1993)* (quoting *Goldman v. Gallant Secs. Inc., 878 F.2d 71, 73 (2d Cir. 1989))*, cert. denied, *513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994)*. As with a motion to dismiss pursuant to *Rule 12(b)(6)*, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in

favor of [the] plaintiff." *Raila v. United States, 355 F.3d 118, 119 (2d Cir. 2004)*; see *Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003)*, [*10] cert. denied, *540 U.S. 1012, 124 S. Ct. 532, 157 L. Ed. 2d 424 (2003)* (noting that "[t]he standards for dismissal under *Rules 12(b)(1)* and *12(b)(6)* are substantially identical"). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Raila, 355 F.3d at 119*. Both the moving and non-moving parties "may use affidavits and other materials beyond the pleadings themselves in support of or in opposition to a challenge to subject matter jurisdiction." *Matos v. United States Dept. of Housing & Urban Dev., 995 F. Supp. 48, 49 (D. Conn. 1997)* (citing *Land v. Dollar, 330 U.S. 731, 735, 67 S. Ct. 1009, 91 L. Ed. 1209 (1947))*. The district court also "may inquire, by affidavit or otherwise, into the facts as they exist." *Land, 330 U.S. at 735 n.4*; see also *Exchange Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126, 1130-31 (2d Cir. 1976)*.

Since Thompson is proceeding *pro se*, the Court must apply "less stringent standards" to his submissions than to "formal pleadings drafted by lawyers." *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*. The Court will also [*11] "interpret [his papers] to raise the strongest arguments that they suggest." *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)*. When faced with a motion to dismiss a *pro se* complaint, a district court "must construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)*. The proper inquiry is "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Twombly v. Bell Atl. Corp., 425 F.3d 99, 106 (2d Cir. 2005)*.

### III. Discussion

#### A. *Eleventh Amendment* Immunity

As a preliminary matter, the defendants argue that they are immune to suit by Thompson. Thompson's amended complaint asserted all of his claims against the state of Connecticut and state agencies. For purposes of application of the *Eleventh Amendment*, state agencies are considered part of the state. *Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 50, 52, 115 S. Ct. 394, 130 L. Ed. 2d 245 (1994)*. A state cannot be sued in federal court unless it is pursuant to a cause of action established through Congress's [*12] power to abrogate *Eleventh Amendment* immunity. *Regents of Univ. of California v. Doe, 519 U.S. 425, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997)*. The Supreme Court has specifically held that *42 U.S.C. § 1983*, the vehicle through which a plaintiff may sue a state for violations of his constitutional rights, does not abrogate such immunity. *Pennhurst State Sch. &*

*Hosp. v. Halderman, 465 U.S. 89, 99, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)* (discussing *Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979))*. Because of this, the defendants argue, Thompson's constitutional claims are improperly asserted against these defendants and must be dismissed.

Subsequent to the defendants' filing of their motion to dismiss, Thompson made an unopposed motion to amend his complaint [docket # 72] to name M. Jodi Rell, the Governor of Connecticut, Raymond W. Beckwith, the chairman of CBEC, R. David Stamm, the administrative director of CBEC, and Salvatore C. DePiano, the chairman of SWGC, as defendants in their official capacities. The Court granted Thompson's motion [docket # 75]. Because the defendants now include state officials sued in their official capacities for declaratory and injunctive relief, which the [*13] *Eleventh Amendment* permits, the defendants' argument for dismissal on the ground of immunity is moot. *Idaho v. Coeur D'Alene Tribe of Idaho, 521 U.S. 261, 269, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997)* (reaffirming that this exception to immunity is well-established); *Ex parte Young, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*.

**B. Justiciability**

The defendants argue that three of Thompson's claims must be dismissed for lack of standing. To have standing under Article III of the U.S. Constitution, a plaintiff must show: (1) he suffered an injury in fact, (2) there is a causal connection between the injury and the defendant's conduct, and (3) his injury is redressable by a decision of the court. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. These three elements ensure that Article III's "cases" and "controversies" requirement is satisfied in all federal cases. *Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003)*. When faced with a motion to dismiss, a plaintiff bears the burden of pleading facts that, if true, would establish standing for each of his claims. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)*. [*14] If any of these three elements are not satisfied for a particular claim, the claim must be dismissed. See *Daimler-Chrysler Corp. v. Cuno, 126 S.Ct. 1854, 1861, 164 L. Ed. 2d 589 (2006); Bennett v. Spear, 520 U.S. 154, 167, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)*. The defendants contend that three of Thompson's claims fail at this stage because he did not plead any injury in fact.

A plaintiff's injury qualifies as a "constitutionally sufficient injury-in-fact" when "the asserted injury [is] 'concrete and particularized' as well as 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Baur, 352 F.3d at 632* (quoting *Lujan, 504 U.S. at 560*). This requirement of a particularized harm ensures that the plaintiff

has a personal stake in the outcome of the lawsuit and prevents federal courts from serving as "merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." *Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 473, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982)*. Additionally, the requirement "recognizes that if an injury is too abstract, the plaintiff's claim may not be capable [*15] of, or otherwise suitable for, judicial resolution. *Baur, 352 F.3d at 632* (citing *Raines v. Byrd, 521 U.S. 811, 819, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997))*. In light of these constitutional concerns, "[t]o support standing, the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Id.* (citing *Lujan, 504 U.S. at 564-65 n.2)*.

**1. Justiciability of Thompson's Challenge to CBEC's Implementation of Practice Book § 2-8(4)**

Thompson's complaint asserts that CBEC's decision to unconditionally deny internet law school graduates permission to take the bar, as expressed on CBEC's website, constitutes an unconstitutional implementation of Practice Book § 2-8(4). The defendants argue that Thompson lacks standing to bring this challenge because he did not suffer an injury in fact: since Thompson never petitioned CBEC for approval of his legal education, CBEC never rejected his petition, and so CBEC's enforcement of Practice Book § 2-8(4) never injured him. The defendants also argue that the claim is not ripe for review.

Thompson contends that [*16] he is sufficiently injured by the statement on CBEC's website. Thompson points out that his submission of an Evaluation Petition to CBEC would be futile in light of the statement. Since it is certain that CBEC would reject any petition from an internet law school graduate, Thompson argues, he need not submit a petition to establish a concrete injury in fact.

The Court concludes that Thompson has not pled a sufficiently "concrete and particularized" injury in fact. While the outcome of CBEC's review of Thompson's petition may appear to be predetermined by the language concerning internet law school education on CBEC's website, any decision by CBEC is appealable to the Connecticut Superior Court. *Scott v. State Bar Examining Comm., 220 Conn. 812, 601 A.2d 1021, 1030 (Conn. 1992)*. Moreover, the legal significance of this statement on CBEC's website is uncertain. [6] Thompson does not claim that Practice Book § 2-8(4) or CBEC's official regulations prohibit CBEC from approving internet law school education for all applications; rather, Thompson alleges only that submitting a petition is futile in light of the website's statement. However, the policy-making

ЭЭЭ

Н Н

Н

must ultimately obtain CBEC's approval, requiring him to petition CBEC now presents no substantial hardship to him that outweighs the risks inherent in an otherwise premature review of this claim.

9    Although ripeness presents a separate justiciability question from standing, the two doctrines overlap in that both require the plaintiff to have sustained an injury in fact. See Erwin Chemerinsky, Federal Jurisdiction, § 2-4 at 114 (4th ed. 2003). As with standing, an injury in fact is a constitutional requirement for a case to be ripe for review. See id.

[*22] Accordingly, the Court finds that Thompson lacks standing to challenge CBEC's implementation of Practice Book § 2-8(4), and also that this claim is not ripe for review.

## 2. Standing to Challenge CBEC Regulation Art. II-1(B)

Thompson's complaint could also be read to allege that CBEC's Regulation Art. II-1(B), which sets the criteria for law schools seeking approval by CBEC, violates his constitutional rights. As explained above, graduates of law schools approved by CBEC may sit for the bar exam without petitioning CBEC for individualized approval or pursuing post-graduate legal education. See Practice Book § 2-8(4). All ABA-accredited schools are approved by CBEC. Connecticut Bar Examining Committee Regulations, Art II-1(A) (2007), available at http://www.jud.state.ct.us/CBEC/regs.htm#II. In addition, a non-ABA accredited law school may petition CBEC for approval in accordance with CBEC Regulation Art. II-1(B). The criteria CBEC considers in deciding whether to grant a law school's petition include whether the school previously sought and was denied ABA accreditation, whether the school is licensed and approved within the state in which it is located, the types [*23] of courses the school offers on subjects tested on the Connecticut bar exam, the school's available courses on legal writing, whether the school requires courses in legal ethics and professional responsibility, the school's bar passage rates, and the school's anti-discrimination policy. CBEC Regulation Art. II-1(B)(i)-(x). The Regulation specifically provides that only law schools, and not individual bar applicants, may petition CBEC to include the law school on CBEC's approved list of schools. CBEC Regulation Art. II-1(B).

To the extent that Thompson challenges the constitutionality of CBEC Regulation Article II-1(B) on behalf of his law school, his claim is dismissed for lack of standing. West Coast is not a party to this lawsuit. An individual "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal

rights and interests of third parties." *Kowalski v. Tesmer, 543 U.S. 125, 129, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004)* (quoting *Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*). A plaintiff may assert the rights of third parties only when two criteria are met: (1) the plaintiff and the third party have a "close" relationship, and (2) when [*24] the third party faces obstacles in asserting its own rights. *Id.* (quoting *Powers v. Ohio, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991)*). As Thompson did not include any allegations in his complaint addressing these two requirements, he lacks third party standing to bring any claims asserting West Coast's rights. [10] Consequently, the defendants' motion to dismiss Thompson's challenge to CBEC's Regulation Art II-1(B) is granted.

10    The Court also notes that Thompson has pled no facts that could give rise to a concrete injury in fact for West Coast's claim, because it appears that West Coast never applied to be included on CBEC's list of approved schools.

## 3. Standing to Challenge SWGC's Enforcement of *Conn. Gen. Stat. § 51-88*

Thompson's challenge to *Conn. Gen. Stat. § 51-88*, which prohibits the unauthorized practice of law, seems to include a challenge to SWGC's enforcement of the statute. Thompson alleges that he is harmed by SWGC's failure to prosecute [*25] law student interns who provide legal services in Connecticut for the unauthorized practice of law. This claim also fails for lack of standing, because "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Friends of the Earth, 528 U.S. at 203* (quoting *Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S. Ct. 1146, 35 L. Ed. 2d 536 (1973)*). To the extent that Thompson's challenge to *Conn. Gen. Stat. § 51-88* challenges SWGC's non-prosecution of legal interns, the defendants' motion to dismiss is granted.

## C. Thompson's Vagueness Challenge to *Conn. Gen. Stat. § 51-88*

Thompson challenges *Conn. Gen. Stat. § 51-88*, which prohibits the unauthorized practice of law, as unconstitutionally vague. Thompson claims that the statute is vague because he, as an internet law school graduate, could be prosecuted for the unauthorized practice of law, while law student interns are not subject to prosecution. Since Thompson takes issue with the enforcement of the statute, rather than its language, the Court approaches Thompson's claim as an "as-applied" vagueness [*26] challenge.

Courts must analyze constitutional "as applied" vagueness challenges under a two-part test. First, the court "must determine 'whether the statute gives the per-

son of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Farrell v. Burke, 449 F.3d 470, 486 (2d Cir. 2006)* (quoting *United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)*). Then, the court should assess "'whether the law provides explicit standards for those who apply it.'" *Id.* (quoting *Nadi, 996 F.2d at 550*). With regard to the second prong of this test, even if a statute does not provide sufficient general guidance to those who enforce it, an as-applied vagueness challenge will still be unsuccessful if "the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement." *Id. at 494; Nadi, 996 F.2d at 550* ("Because the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.").

*Connecticut General Statute § 51-88* provides [*27] that:

(a) A person who has not been admitted as an attorney under the provisions of section 51-80 shall not: (1) Practice law or appear as an attorney-at-law for another, in any court of record in this state, (2) make it a business to practice law, or appear as an attorney-at-law for another in any such court, (3) make it a business to solicit employment for an attorney-at-law, (4) hold himself out to the public as being entitled to practice law, (5) assume to be an attorney-at-law, (6) assume, use or advertise the title of lawyer, attorney and counselor-at-law, attorney-at-law, counselor-at-law, attorney, counselor, attorney and counselor, or an equivalent term, in such manner as to convey the impression that he is a legal practitioner of law, or (7) advertise that he, either alone or with others, owns, conducts or maintains a law office, or office or place of business of any kind for the practice of law.

(b) Any person who violates any provision of this section shall be fined not more than two hundred and fifty dollars or imprisoned not more than two months or both. The provisions of this subsection shall not apply to any employee in this state of a stock or nonstock [*28] corporation, partnership, limited liability company or other business entity who, within the scope of his employment, renders legal advice to his employer or its corporate affiliate and who is admitted to practice law before the highest court of original jurisdiction in any state, the District of Columbia, the Commonwealth of Puerto Rico or a territory of the United States or in a district court of the United States and is a member in good standing of such bar. For the purposes of this subsection, "employee" means any person engaged in service to an employer in the business of his employer, but does not include an independent contractor.

(c) Any person who violates any provision of this section shall be deemed in contempt of court, and the Superior Court shall have jurisdiction in equity upon the petition of any member of the bar of this state in good standing or upon its own motion to restrain such violation.

(d) The provisions of this section shall not be construed as prohibiting: (1) A town clerk from preparing or drawing deeds, mortgages, releases, certificates of change of name and trade name certificates which are to be recorded or filed in the town clerk's office in [*29] the town in which the town clerk holds office; (2) any person from practicing law or pleading at the bar of any court of this state in his own cause; (3) any person from acting as an agent or representative for a party in an international arbitration, as defined in subsection (3) of section 50a-101; or (4) any attorney admitted to practice law in any other state or the District of Columbia from practicing law in relation to an impeachment proceeding pursuant to Article Ninth of the Connecticut Constitution, including an impeachment inquiry or investigation, if the attorney is retained by (A) the General Assembly, the House of Representatives, the Senate, a committee of the House of Representatives or the Senate, or the presiding officer at a Senate trial, or (B) an officer subject to impeachment pursuant to said Article Ninth.

*Conn. Gen. Stat. § 51-88.* In addition, the Court takes judicial notice of Practice Book sections 3-14 to 3-21, which establish the rules that govern legal interns' practice of law in Connecticut. Among many restrictions, legal interns representing clients must submit to full supervision by a licensed attorney at all times. Practice [*30] Book § 3-15. Practice Book § 3-20 specifically provides that non-compliance with the rules governing

2007 U.S. Dist. LEXIS 27808, *

legal interns--including the supervision requirement--leaves legal interns open to prosecution for the unauthorized practice of law. Practice Book § 3-20 ("Nothing contained in these rules . . . shall enlarge the rights of persons, not members of the bar or legal interns covered by these rules, to engage in activities customarily considered to be the practice of law.").

In light of the clearly defined status afforded to legal interns working under the Practice Book's rules, Thompson's vagueness challenge fails as a matter of law. Thompson's complaint reveals that he seeks the full privileges of licensed attorneys admitted to the bar, not the opportunity to work as an intern under the supervision of other lawyers. Because of this, Thompson's claim meets neither prong of the vagueness test. The statute clearly conveys that the practice of law in Connecticut by anyone, including a non-supervised legal intern, without being admitted to bar, would violate *Conn. Gen. Stat. § 51-88*. The practice of law by non-admitted attorneys and non-supervised legal interns [*31] also "falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement." *Farrell, 449 F.3d at 494*. Accordingly, Thompson's vagueness challenge is dismissed. [11]

> 11   The Court also notes that *Conn. Gen. Stat. § 51-88* has survived two previous vagueness challenges. *Statewide Grievance Comm. v. Patton, 239 Conn. 251, 683 A.2d 1359 (Conn. 1996)*; *Grievance Comm. of the Bar of Fairfield County v. Dacey, 154 Conn. 129, 222 A.2d 339 (Conn. 1966)*.

**D. Abstention**

As an alternative to dismissing Thompson's constitutional challenge to CBEC's implementation of Practice Book § 2-8(4) for lack of standing or ripeness, the defendants argue that this Court should abstain from ruling on the claim pursuant to *Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643, 85 L. Ed. 971 (1941)*. The defendants argue that since the legal significance of the statement on CBEC's website presents an unsettled question [*32] of state law, Pullman abstention is appropriate.

A federal court should abstain from deciding unsettled questions of state law that must be resolved before the court can address a federal constitutional question. *Pullman, 312 U.S. at 500*. "By abstaining in such cases, federal courts will avoid both unnecessary adjudication of federal questions and needless friction with state policies." *Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 236, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984)* (citation and quotation marks omitted). Abstention based on this doctrine "'involves an inquiry focused on the possibility that

the state courts may interpret a challenged state statute so as to eliminate, or at least to alter materially, the constitutional question presented.'" *Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus, 60 F.3d 122, 126 (2d Cir. 1995)* (quoting *Ohio Bureau of Employment Servs. v. Hodory, 431 U.S. 471, 477, 97 S. Ct. 1898, 52 L. Ed. 2d 513 (1977)*; see *San Remo Hotel, L.P. v. City & County of San Francisco, 545 U.S. 323, 339, 125 S. Ct. 2491, 162 L. Ed. 2d 315 (2005)* ("[T]he purpose of Pullman abstention . . . is to avoid resolving the federal question by encouraging a state-law determination [*33] that may moot the federal controversy."). Because of this underlying concern, Pullman abstention is appropriate only when three criteria are established: "(1) an unclear state statute or uncertain state law issue; (2) determination of the federal issue turns upon resolution of the unclear state law provision; and (3) the state law provision is susceptible to an interpretation that would avoid or modify the federal constitutional question presented." Id.; see *Hawaii Hous. Auth., 467 U.S. at 236* (holding that courts should abstain under Pullman only when the state statute is "fairly subject to an interpretation which will render unnecessary adjudication of the constitutional question" (quotation marks omitted)).

The Court agrees that if Thompson's challenge to CBEC's implementation of Practice Book § 2-8(4) did not suffer fatal standing and ripeness defects, *Pullman* abstention would be proper for that claim. Assuming that Thompson had stated an injury in fact, this case would meet all three of the necessary Pullman criteria. First, as discussed in Part III-B-1, supra, the legal significance of the statement on CBEC's website's rejecting internet [*34] legal education presents an uncertain question of state law. Second, Thompson's constitutional challenge to CBEC's implementation of Practice Book 2-8(4) depends on the legal significance of the website's statement; without knowing whether CBEC may use the website's statement as its official policy in administering the rules governing bar admissions, the contours of the constitutional challenge to CBEC's actions are not clearly defined. Finally, if the Connecticut courts determine that CBEC may not use such a policy to automatically reject internet law school graduates from taking the bar, then Thompson's constitutional claim will be moot. The Connecticut courts are the proper forum to first determine the correct degree of legal import, if any, that must be given to the statement on CBEC's website. Because the Connecticut courts' resolution of this question could render a constitutional decision in this Court unnecessary, this Court would exercise its discretion to abstain from presently deciding Thompson's challenge to CBEC's implementation of Practice Book § 2-8(4) under Pullman. [12] However, since the Court concludes that Thompson has not pled a sufficient injury in fact for [*35] this claim,

the Court dismisses it for lack of standing and ripeness instead of staying the action.

12   If this Court abstained under Pullman the Court would retain jurisdiction over the action until the state law question is resolved. See *Am. Trial Lawyers Ass'n, New Jersey Branch v. New Jersey Supreme Court, 409 U.S. 467, 469, 93 S. Ct. 627, 34 L. Ed. 2d 651 (1973)* ("The proper course is for the District Court to retain jurisdiction pending the proceedings in the state courts."). Such abstention would not force Thompson to litigate his federal constitutional claims in state court, with federal review available only through appeal to the U.S. Supreme Court. *England v. Louisiana State Bd. of Med. Exam'rs, 375 U.S. 411, 417-22, 84 S. Ct. 461, 11 L. Ed. 2d 440 (1964)* (establishing procedures to ensure litigants subjected to Pullman abstention may litigate federal questions in federal court); see *San Remo Hotel, 545 U.S. at 339-340*.

**IV. Conclusion**

For the reasons given above, the defendants' motion to dismiss [*36] [docket # 43] is granted. The plaintiff's motions for summary judgment [docket #s 58, 60] are denied as moot. Judgment is entered for the defendants, and the clerk is ordered to close this case.

SO ORDERED this 30th day of March 2007, at Hartford, Connecticut.

/s/ **Christopher F. Droney**

**UNITED STATES DISTRICT JUDGE**